The court has five cases scheduled for argument this afternoon. Set forth in the calendar. Madam Clerk, would you please call the first case for argument. 19-2554 19-3662 and 20-1438 from the District of Eastern Missouri. Jo Ann Howard & Associates at all be National City Bank at all. All right. I think we'll ask the lawyer who's not arguing to go ahead and mute the microphone just to eliminate any risk of feedback. And Mr. Bennett, we'll hear from you first. Your Honor, do you want me to go off screen too? No. Okay. Thank you. Good afternoon, Your Honors, and may it be a pleasure to be here. This is the second appeal of this case by PNC over the conduct of Allegiant Bank. Allegiant was a local St. Louis bank acquired by National City in 2004 and PNC is here because it acquired National City in 2008 in the midst of the financial crisis at the request of regulators. In the prior appeal, the court remanded this case for a trial primarily for a determination in equity of the amount of loss to the Missouri Trust caused by any breaches of duty during Allegiant's tenure. At the outset, it's important to note that PNC is not appealing $46 million in damages in light of the standard of review and other issues. PNC is appealing what it describes as several add-ons that the District Court made to that amount that we believe are not called for under Missouri Supreme Court precedent or Missouri law in this diversity case. As the court is aware, it is bound by the Missouri Supreme Court statements and looks for, as it has said previously in this case, foreshadowing from the Missouri Supreme Court. I'd like to start with interest. The court assessed $12.2 million in interest in this case and it is the case that no case in Missouri from the Supreme Court or the Court of Appeals has ever affirmed an interest award where damages are not ascertainable. Here, the trial court correctly found that plaintiff's theories and claims for category of damages vacillated over the litigation and as the court is aware, and two members of the panel are certainly aware from being on the decision, the case was pursued under tort theories at first with lots of different damages model and it was unascertainable. Where the trial court erred on remand is that these damages did not suddenly become ascertainable after the 8th Circuit holding which is what the court held at Addendum 304. In fact, the Missouri Supreme Court has a case where it declared what the proper measure of damages was and remanded and actually held no interest would be permitted because damages were not ascertainable because they weren't before remand and that's the American Eagle case from the Missouri Supreme Court in 2012. The court here was in equity and there is an unbroken line of equity cases as well that hold that you can't do interest for unliquidated damages. Our lead case is Healthcare Foundation which had very similar situation with 140 page judgment, special masters, experts, moving damages and the court held no interest could happen there even though the trial court had awarded it and even though it was in equity. In 2020, the Supreme Court in Robinson quoted Healthcare Foundation with approval and affirmed the denial of interest in a case where damages were disputed. And here post remand damages were equally non-ascertainable to before. Plaintiffs presented, I believe, six separate experts on damages after the remand. Our first Rule 26 disclosure on damages we received added up to $1.2 billion of damages sought and there were statements throughout from council and the district court that damages were a moving target and that a major issue was which was right. And they presented two alternative damages theories even under one component, the breach of trust damages, where they had a man, Mr. Brown, who said it was $108 million and he said it wasn't ascertainable. And then a Mr. Dalton who did actuary calculations where he said that in light of all of the assumptions that he had made that you had to be an expert to even understand them. And so we would ask, and that setting aside the 205B damages that were in the hundreds of millions of dollars. And so we would ask that this court follow the unbroken guidelines of courts in the 205B and hold that you can't have interest under these circumstances. And that's our first point, but it is the case that plaintiffs cited no case and the district court cited no case that permitted interest where damages were unascertainable. The next add-on to damages that we challenge is punitive damages. Before you go on, may I raise one question about the interest? Certainly. Did Judge Weber base the damages amount on the bank's expert's testimony as opposed to the other experts that you just cited who said that the amount was hard to figure out? Yes, he started as a framework for the single damages, the damages of Mr. Long, who was an actuary. But Mr. Long, importantly, there's I think 15 findings of fact regarding his damages as well. His damages also were not ascertainable because he had to make assumptions about interest rates. He had to make assumptions about mortality tables. He had to, in fact, he thought that three different deductions needed to be made in the case, including reductions for the timing of certain policies. And his damages report was not an invoice, for example. I mean, the classic cases you see where Missouri Courts award interest is in Quantum Meroweth, for example, which was the Vogel case. You submit an invoice and then you don't pay it, and then you get interest on that. And so Mr. Long was equally not ascertainable and certainly didn't come up with the damages. But that's also why the 205B damages are really important. Even in equity, the purpose is can you settle the case, for example? Can you know how much you owe? Throughout this whole remand proceeding, the plaintiffs were seeking hundreds of millions of more dollars than Mr. Long's damages. And so not only was the amount in question, not only did the court reject Mr. Long's actual number, but we had no way of knowing there was a cross-appeal of the damages rulings against the plaintiffs that was pending until March of 2020. And so none of the factors that would lead to interest are present here. But you are correct that the starting block was one finding of our experts' calculations, but the judge rejected other aspects of it. Well, even if the plaintiffs ask for larger amounts that you resist and think are unfounded, if the bank can say our guy says it was only X and you offer X as an offer of judgment or something, wouldn't that be sufficient to show ascertainability if you had that opportunity? Well, you might if he said that. Now, of course, our person said that the damages were $40 million, which is exactly what we're not appealing. And what happened was Judge Weber rejected various aspects of our experts' opinion. He came in and said it's $26 without policy loans, it's $40 with policy loans. Judge Weber said, I'm going to take one portion of your calculation and go with it. But our person had actuarial damages of $26 million without policy loans and $40 million if you counted them. So even our guy didn't say it was $72. All right. And do you have anything to say about these authorities that the appellee cites regarding prejudgment, interest and equity? Is the Missouri law really as clear as you suggest from the Health Care Foundation case, or are we going to have to Missouri law and the restatement allow prejudgment, interest and equity without ascertainability? I believe that the law is that clear, Your Honor. And in fact, you can go back to we've been deciding equity cases in Missouri courts probably since the last Constitution. There hasn't been interest awarded in equity on a non-ascertainable amount. And Health Care Foundation is definitely equity. Robinson, which is the new case, is definitely equity. And they affirmed the denial of interest because it was unliquidated and because no demand was made. Carpenter, which is a Missouri Supreme Court case from 2008, allowed interest in equity because it had a certain date that the charges were made and everybody knew the amount. Vogel, a Missouri appellate court in equity case, demand was made for $3,800 and some change dollars, and it had a specific date that it wanted it. And so, Your Honor, that in equity, they often recite it's equitable and it's within the court's equity discretion to do it, which is what Judge Weber even said. Judge Weber never said in this decision there's some bright line rule. And you don't see any cases in 100 years awarding interest under those circumstances. And so, I think that once the judge said it needs to be ascertainable and it was not ascertainable, I think that that should end the matter under Robinson and under Healthcare Foundation, under Carpenter, under Vogel, and under all the cases. Would that be a departure from the restatement, which seems to say the rule is different at equity than at law? I don't think that it would be a departure because what I view it as is at equity, equity the court takes into account various factors, all of which become subsumed in the ascertainability issue, which is something along the lines of did the party know how much they owed so they could pay it? Did the party have a set amount of money that it had the use of for a long time and it didn't do it? Was the plaintiff out a certain use of the money? All of those things get then wrapped up in Missouri at least under the idea of ascertainability. So, I guess it would depend on how you interpret the restatement because I do think Missouri and Judge Weber recite the general equitable rules and then when you look at how it's applied, they say that certainly it's been an unbroken string of cases requiring ascertainability and I don't believe Robinson and Healthcare Foundation and Carpenter are to the contrary on that at all. Alright, I know you wanted to talk about other issues but I appreciate your addressing those questions. Thank you, Your Honor. Of course. Punitive damages is a $15 million add-on. We have two extremely basic points to make here. The first is that there is no Missouri case that upholds punitive damages in the absence of self-dealing by the trustee. Here, we got paid a fee and it was a small fee and the judge found that we mismanaged it and we're not appealing that finding. But, there is no self-dealing and in fact the judge in his last opinion, page of his opinion at page 305 talks about the idea there being no self-dealing. There is no fiduciary case approving punitive damages in the absence of self-dealing and this court has adopted that two different times, first in Bold but most importantly in Kester which Judge Wolman was on the panel of. But, Kester is an extremely important case here because in our view is directly on point and what Kester had was a fiduciary who had been arrested, who had been convicted, who took the theft, who was accused of harming the beneficiaries by millions of dollars, but there was no self-dealing. And in Kester, this court reversed the punitive award of also several million dollars and noted quote, there was no quote self-dealing or misappropriation of funds in connection with the transactions. And so, Kester is right on point and the plaintiffs, if you look at their table of authorities, don't even cite the case or discuss it. But, Kester is very important and stands for a Missouri proposition that there is no punitives without self-dealing and Kester goes back to a case called McKetchin which is the Missouri case that's also discussed here where punitives were awarded where the fiduciary acted to further their own financial position which is different. Well, I wonder if you're overstating Kester because Kester says the plaintiffs essentially argued that any breach of fiduciary duty warranted award of punitives. And the court distinguished McKetchin because there was self-dealing, but query whether that's the same as saying self-dealing is a mandatory factor. I think we would then go to what Kester looked to and what the Missouri cases looked to. If you say what are the big fiduciary punitive cases in the history of Missouri? Kester, of course, talks about McKetchin as one where the court noted that it acted for its own purpose of self-dealing and this court certainly found it important. But in Norber, which is the other big fiduciary punitive case in Missouri, found that the partner who was liable for punitives wrongfully transferred funds to his personal account and in Gould, which is the third Missouri case that decides it, they specifically had a finding that the trustees acted and engaged in self-dealing. And so what I think you could safely say is even if we would have an argument about whether Missouri Supreme Court has ever come out and said there must be self-dealing, we have an unbroken body of fiduciary law about punitive damages that recognize that self-dealing is a critical factor. And then combine it with the next issue on appeal, which is that in assessing punitive damages, the Missouri law requires a finding for recklessness that you must infer an evil motive and it must be egregious. That's Acorn and Reed Judge Weber's decision, he made two findings of evil motive. Both of them were about this world services policy that our trustee transferred to the successor bank that he found was without value and that he thought that the trustee who was testified in 2020 was not telling the truth when he testified about it. And he made also two findings of egregiousness, which were about the same fact. And what we have in Missouri is a well-developed doctrine, which is Vaughn from the Missouri Supreme Court, which says very clearly that in Missouri the law has always required that a plaintiff's damages be the direct result of the wrongful acts alleged otherwise a plaintiff could rove through all the conduct and hold them liable for punitives even if there was no damage. And here it is unquestionably the case that there was no damage associated with either the world services, and I just point the court to Addendum 291 where the court flat out found that world services in this transfer caused no damage. As to this testimonial issue, Oster, which is the Missouri case we rely on, also says that it's only defendants at the time the wrongful act was committed that's determinative of whether the defendant can be found liable for punitives. And so we really have two mistakes on punitives. One is there was no self-dealing. Two is that he clearly relied for his critical findings required under the law of evil motive and egregiousness. The only findings, you can do a control F search for evil and you can do it for egregious. His only findings were about things that didn't cause damage. Now, Your Honor, on compensatory damages we would note just that this case involved one claim of breach of trust and on 213, which is the restatement provision, the court committed legal error by not quoting the second part of that, which says you look to whether the breaches are distinct. And here the breaches are not distinct. It's pledged in a single count. Rule 10 would say you have to plead these separately. There's a single judgment here as well, and there's even this only one trust instrument in evidence. And so we would ask that the court look hard at the $11 million under 213 for separate trusts. In addition, Your Honor, we challenge the $7 million of attorney's fees, and this is, again, the third way in which the court strays from the teachings of the Missouri Supreme Court. Clayton Terrace in 2019 was the third case since 2019 where they had reversed fees under this special circumstances exception. The Missouri Supreme Court has never allowed fees under special circumstances outside declaratory judgments. And declaratory judgments is important because it has a cost-shifting provision that the court had interpreted. So I would just urge the court to note there's been no Missouri Supreme Court case approving interest in equity with unassertainable damages. There's been no Missouri court that upheld punitives with no self-dealing. Missouri's clear it has to be injury-causing conduct, and there's no Missouri Supreme Court saying that you can use special circumstances like the judge did here. I'd like to reserve the remainder of my time if there are no further questions for Rabeau. On the fee issue, are you sure that the Missouri cases are really interpreting the cost provision in the declaratory judgment statute to include fees, or just doing some kind of freestanding fee award independent of the cost? It's definitely interpreting the cost. Clayton Terras makes a special point of saying no case has ever allowed this outside the circumstance of declaratory judgment action. And they're looking at that 527.100, which is the DJ case where they allow costs. And what they say is there's this body of law for special circumstances under that provision where they extend costs. And they make clear, even saying later court of appeals cases have nonetheless extended this beyond non-declaratory judgment actions. Clayton Terras is the key to this on 285 and 286 where they are talking about it being in the context of DJ. Well, I know that's the history of it. I'm just questioning whether there's any basis in the text of the statute about costs to award fees. I mean, I thought some of the earlier cases said we acknowledge that the statute only allows for costs. But if we go back to that old case from the 1940s where they awarded fees to a trustee and it's just I just wonder whether they're really interpreting the word cost to mean attorney's fees or whether they're going beyond it. But I understand you think it's an interpretation of the statute, so we'll look at that carefully. And if I could, Your Honor, just very briefly point you to 285 on Clayton Terras where they actually say this sentence. Several cases have recognized that attorney's fees may be awarded as costs under 527.100. Okay. And that's the key language there. It's a paragraph that begins the declaratory judgments make no reference to fees, but they have interpreted them to be awarded as costs under the specific statute where unusual circumstances are shown. I just don't think as a matter of Missouri law that there's much doubt that the Supreme Court at least says that. That's a quote from some other case. The part you just read. Maybe from Beard. It's actually a verbatim from Clayton Terras. However, several cases have recognized No, I'm saying the quote you read from Clayton Terras appears to be an internal quote from some earlier case. Yeah, they cite Beard. They don't show that it's an internal quote, but they definitely cite Beard. You don't think it's a quote. Okay. It's indented as though it's a black quote. It's a little confusing. Oh, you might be right, Your Honor. I'm sorry. Yeah, I think you're right. I'm looking at it on a Westlaw print also. All right. Well, thank you for your argument. Mr. Riley, we'll hear from you. Mr. Bennett, you can mute yourself if you would, please. Thank you, Your Honor. May it please the Court. Judge Weber issued a 901 paragraph finding of fact multiple conclusions of law and in doing so, he followed clearly Missouri law and used his equitable discretion to make the four monetary awards that PNC seeks to reduce now. The most critical one is his finding that the trust losses during the Allegiant time frame that resulted from Allegiant's wholesale failure to meet its fiduciary obligations as a professional trustee were $72.2 million. Contrary to counsel's statement, that is the number that PNC's expert calculated to be the trust losses in the three trusts on which we pursued claims. That is Judge Weber's manifestation that he followed this Court's directive and applied Restatement Second 205A. And those 205A losses were reasonably calculable at the time Allegiant no longer was serving as a trustee from the last day on, pursuant to the testimony of Mr. Long, PNC's expert. Those losses were fixed, they were final and they were calculable by a standard method of actuarial science, as testified to by PNC's expert, and our actuary expert agreed. That was a recognized standard. It's undisputed that in Trust 4, which is the major activity trust, that when Allegiant took it over, it was in the whole $33 million and when Allegiant was complete with its trusteeship it was in the whole $99 million. That $66 million loss is the diminution in value of the trusts during that era and limited the losses pursuant to the remand order to that time frame. The other $6 million in losses to get to $72 million comes from two trusts that Allegiant also oversaw, CSA and MTW. There's no support in the record in Missouri law or in equity to reduce that number by offsetting gains in separate and distinct trusts and Ramsey the case that both parties cite is constructive but even within the same trust, if the PNC does not support it, there's no reason to offset it. On the fundamental finding of, for example, policy loans, the second way they try and reduce the trust losses, those are losses Judge Weber found were resulting from Allegiant's failure to maintain control of the insurance policies. They allowed a Ponzi scheme to be run through the bank by, in Judge Weber's words, giving the keys to the vault to NPS. NPS was the seller that checked the 436 was supposed to support and was supposed to protect the consumer money from. That failure was what caused the policy loans and that failure is based upon Allegiant's failure to have systems to check the dollars in and out of the trust, the fact that they created this trust department for marketing purposes, not to provide high-level fiduciary services, and that they then dumped the trust at the end at the direction of National City Bank, who was going to acquire them. That conduct, Judge Weber found was intentional, was self-interested, both at the beginning and throughout the trust, and that misconduct constituted reckless indifference to the rights of the beneficiaries and the funeral homes. That conduct resulted in losses that were readily ascertainable at the end of the Allegiant era. Judge Weber did find that the losses in this case were readily ascertainable, and he found it because he determined they were fixed and final and subject to calculation pursuant to a standard methodology. And Judge Weber did find that that interest was justified here in order to compensate the plaintiffs for the true cost of their loss from the trust. The court properly corrected the start date and the end date on the interest, and those decisions he made there were subject to clear error, and he properly found that he was entitled to award prejudgment interest under the Missouri law. What was the basis for correcting the end date under the clerical error rule? How was that a clerical error as opposed to an analytical mistake of some kind? Well, I think the judge felt, and from what we saw and know, I believe the judge believed that once PNC had invoked his 60A authority, that he could both fix the beginning date and fix the end date and get it right. I know that's what he believed, but I'm asking what's the basis for that authority under 60A, which refers only to clerical errors? I mean, you didn't have a 60B motion, did you? No, we did not. No, we did not. We sat on the interest as it was originally awarded, and I think the court got the number right. What's really going on here is that PNC is asking this court to reject and reverse what is plainly a mistake. The interest is supposed to run pre-judgment up to the time of the date. I think the court had inherent authority to do it correctly. Counsel, I believe, in PNC in his briefing ignores what Judge Weber did in awarding punitive damages. He applied Missouri law, the standard Missouri law of conduct being outrageous and based upon either evil motive or a reckless indifference to the rights of others. That's the standard that he applied. There is no Missouri case limiting punitive damages against a trustee of self-dealing. Kester doesn't say that. It provides examples of self-dealing and misappropriation, but that's not the holding of it. The Norber case they cite and the Bradshaw cases they cite, those do not hold anything other than it may be in the event of self-dealing appropriate for the court to conclude that the conduct is outrageous. In this particular setting, Judge Weber made a factual determination that allegiance conduct constituted a reckless indifference for the rights of the beneficiaries and the funeral homes. He was within his discretion to do that. He argued that the finding he made was based on the transfer to Bremen Bank which the bank said didn't cause any harm and that as a legal matter the conduct that justifies the punitive damages must be harm-causing. Could you address that? Sure. Judge Weber made clear that he viewed the conduct of allegiance being self-interested and intentional throughout the entire trust era. He was critical of the purposes by which allegiance started its trust department. It was conceded they did not do so to provide trust services. They did so to make it look like they were a full-service bank. Judge Weber found they under-trained the trust department, that the trust department was unskilled and not prepared to handle the trusts that were the 436 trusts they were inheriting. He found that throughout the trusteeship there was a systematic creation of processes by which allegiance would never review the dollars coming in and dollars coming out, would do whatever NPS asked it to do, and that as a consequence of that, NPS had total control of the life insurance policies, which they manipulated through policy loans and through manipulation of the premiums. And then at the end of the trusteeship, the acquiring bank, National City Bank, directed allegiance to get rid of the trusts. They did so at the direction of their new owner. They did so disloyally to their own interests, and they did so by misleading the future trustee about how the banner of the trust was handled. Judge Weber was well within his discretion to consider that misconduct as consistent with the recklessness that he had found by the trustee throughout its trust era. Similarly, Judge Weber found that Mr. Morrissey repeatedly provided false testimony. Mr. Morrissey is the Allegiant Bank trust officer who had the day-to-day responsibility in these trusts. He was well within his discretion to consider that conduct as evidence of guilt. Mr. Morrissey told a very different story the second time around than he did the first time around, and Judge Weber called him out in its findings multiple times. The Vaughn case that counsel relies upon to suggest that conduct that doesn't cause harm cannot be used to support punitive damages. In Vaughn, the defect that caused the coffee maker to catch on fire was a completely different defect than the ones that the plaintiffs were trying to put into evidence, and the court said, no, that didn't cause any harm, and it's unrelated to the conduct. Allegiant's conduct in dumping the trust was consistent with, and the final step in the pattern of abdicating its fiduciary duties as a professional trustee in the six years that it failed in those obligations. Your Honor, I think that Judge Weber found that the losses were readily ascertainable. So while we   were readily ascertainable. So while we argued that Judge Weber had a clean field in equity to decide whether he would award interest or not, and when you look at the cases, and that includes the Robinson case, which is the Missouri Supreme Court case in May of last year, the language always is interest should be readily ascertainable, except in cases of equity when the court has discretion to do so. And that language is repeated multiple times. And in fact, it was expressly shown to be true in Robinson. So I believe that the case law establishes that Judge Weber had free reign to determine whether or not he needed to award interest to compensate the plaintiffs for the true cost of their trust losses, but he put that reasonable ascertainable hurdle in front of him and expressly found that the trust losses were complete, fixed, and final. The arguments that we made different requests for losses, we had claims for relief under 205B and World Service term policy interventions. Those type of arguments were rejected by the court in Machika. The fact that the experts disagree on the amount of the trusts, the fact that the parties disagree is not a basis to disallow prejudgment interest. And particularly in this case, when the losses that are in question are the 205A trust losses, which PNC has said since 2009 were the trust losses they believe should apply in this case. They weren't confused about what they thought those numbers would be. Their expert came in and said it's $77 million and the court accepted their expert's number. Judge Weber properly rejected the efforts by PNC to reduce those numbers by claiming gains in other trusts and as I said, I think the Ramsey case and restatement second to 13 make clear, you couldn't even offset losses in one trust from gains in one trust if it was different property within those trusts. Here we have completely separate trusts with different beneficiaries and different properties. So that offset Judge Weber looked at, properly rejected. As I said, he properly rejected the policy loan effort to reduce the losses, finding that Allegiant caused those policy loans. Those policy loan losses resulted from Allegiant failing to track the dollars in and out of the trust. As to fees, the trial court has tremendous discretion in equity to award attorneys' fees and Missouri recognizes that the special circumstances exception applies to the American rule, applies in Colorado when there is intentional misconduct. This circuit in Kelly v. Golden in 2003 found and recognized the special circumstances exception for intentional misconduct. There is no intervening Missouri Supreme Court decision contradicting that holding of Kelly v. Golden and counsel's efforts to say that Clayton Terrace is that case is not supported by the record. The court in Clayton Terrace recognized a long line of intermediate appellate court decisions, Volk, Barco, Barr, and after Clayton Terrace, the Sova, all that awarded attorney fees because of intentional misconduct when there was no declaratory judgment action involved. And all the Missouri Supreme Court in Clayton did was comment that those cases were in existence and let them stand. And that case, which was written by Justice Stiff, was followed up on by Justice Stiff's opinion in Robinson in May of 2020. In May of 2020, in which the court found that the judge in equity has tremendous discretion to award fees. This is a case in which the court found intentional misconduct. The court found that the allegiant conduct was substantial and throughout the trusteeship and the record supports Judge Weber's finding to that effect. We submitted other bases for supporting the attorney fees ruling, including the applicability of the Uniform Trust Code and cases in equity that predate the statute and will stand on the briefs on those particular issues. Judge Weber put his green eye shade on. He did a deep dive on the attorney's fees. He applied the Hensley-Lodestar test. He looked at the results obtained and determined that because we received all of the Missouri trust losses under 205A and because we found punitive damages were validly awarded, that there was no valid claim that this fee number should be reduced based on a limited success. I also would note that Judge Weber, in looking at the 15 categories that PNC attacked on our fees, made some reductions to 13 of them. So we repeatedly see the court bending over backwards, leaning over backwards to make sure PNC got its day in court, giving them the opportunity to make the arguments that they need to make. He ruled reasonably consistent with the PNC expert on the compensatory damages. He made a modest $15 million punitive award based on, that's a fraction of the 72. He found that prejudgment interest was valid. And he limited the prejudgment interest from the date of the remand. He could have gone back to 2004 at the end of the Allegiant Trust era because their expert admitted he could do the same calculation he did in the trial to get the 72.2 on the three trusts that we pursued. He could have done that at the end of the Allegiant era. And then the court entered, again, what is a modest $7 million attorney fee finding as he could in his discretion that the special circumstances exception applied here in this case because of Allegiant's intentional misconduct. Unless the court has any more questions, I have no further comments. Very well. Thank you for your argument. Mr. Riley? Mr. Bennett, we'll hear from you in Rebella. You're going to have to turn on your microphone. Thank you. I want to start right where that just left off on Clayton Harris and attorney's fees. The Missouri Supreme Court said in 2019 that no case from this court has been cited allowing a finding of special circumstances based on intentional misconduct outside the DJ context to the contrary Rankin, which is the case that the block quote came from, listed a series of non-DJ actions in which it noted that fees had been denied. The Missouri Supreme Court, in addition, has really put the hammer down on this. Trustees of Clayton Harris is one of three decisions since 2019 finding no special circumstances and actually reversing. Would you agree that they've never resolved the question whether special circumstances applies outside of the declaratory judgment? Well, I think if you're looking at foreshadowing, I agree that they don't say in this case it doesn't apply ever when we're holding it here, but they do a couple of things that I think are really important. I'm not talking about foreshadowing. I'm talking about whether there's a holding that would supersede Kelly v. Gold. I think that the fact that the Missouri Supreme Court has said this in Clayton Harris is the statement of law from the Missouri Supreme Court, which this court in diversity would follow. I think Kelly v. Golden doesn't even talk about the DJ context, and so there's no question that Clayton Harris undermines any of the reasoning behind that if it meant to say that it's just a blanket rule. Moving to Mr. Long's calculation, paragraph 866, addendum 255, says Mr. Long's final diminution in trust value is a negative $40 million. Mr. Long did not say it was $72 million worth of damages. If we go to punitive damages in response to your question, Judge Colleton, about no harm, there was a long discussion of facts, but no case law mentioned. Vaughn is clear that you're not permitted to rogue around in misconduct and hold someone liable for punitive damages. The whole discussion of world services, the judge found there are no trust losses associated with it in his findings, and that is enough to make that improper, especially when you combine the lack of self-dealing. And so, Your Honor— Where did the judge get the idea that Long had given a number of $72 million? You keep saying that he only offered $40 million. Yes, so the way that— He cites him as having these two numbers in the 70s. Yes, what happened was Long had opinions about the remand decision, as you're well aware of, says you have to find out what the trust losses are during allegiance tenure. It was Long's view that in order to do that, you had to take out interest rates that had affected the number, and that you had to also, in addition, not count some policies that were issued right at the end of our tenure, because by virtue of the actuarial analysis, it always is negative. And so, what Long said was, my calculation is $40.5 million. I agree 100% that when he added up all of the actuarial analysis, he does come up with a $72 million number in the interim analysis, but his number is not $72 million, and we never agreed that that was the damage number. In fact, Long presented $40.5 for a lot of the reasons we've talked about. But there is a $72 million number in the record, it just was not his calculation. Nor was it— What was he talking about when he offered the $72 number? The pre-adjustment number of the diminution in value in trusts, if you don't count all— if you count just the ones that lost money, if you count policy loans, if you don't reduce your interest rates, and the like. Okay. I think I see that my clock is saying zero, Your Honor, so we would ask that this case be—a judgment be entered in the amount of essentially $45.6 million, and that the rest of the add-ons be reversed. Very well. Thank you both for your arguments. The case is submitted and the Court will file an opinion in due course.